Filed 7/7/25  In re A.B. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.B. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.B.,<br><br>Defendant and Appellant. | F088884<br><br>(Kern Super. Ct. Nos. JD143868-00, JD143869-00, JD143870-00)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Judith M. Denny, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

J.B. (mother) appeals from a juvenile court order removing her children A.B (born Apr. 2013), H.B. (born Feb. 2015) and S.B. (born Apr. 2017)[1] from her physical custody for the third time. Mother argues there is not substantial evidence supporting the juvenile court's removal order. Mother further argues reasonable means existed to protect the children without removal, and the juvenile court erred by failing to order further services under Welfare and Institutions Code section 366.3[2] as a best alternative for the children. Mother finally argues the juvenile court and the Kern County Department of Human Services (the department) failed to comply with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA).[3]

We affirm the juvenile court's dispositional order.

**FACTUAL AND PROCEDURAL HISTORY**

*Juvenile Dependency Petition*

On July 8, 2022, San Bernardino County Child and Family Services (CFS) filed juvenile dependency petitions for A.B., H.B., and S.B., alleging they came within the provision of section 300, subdivisions (b)(1), (c) and (g). Each identical petition alleged the children suffered, or there was a substantial risk the children would suffer, serious physical harm or illness as a result of the failure or inability of their parent or legal guardian to supervise or protect them adequately (*id.*, subd. (b)(1)(A)), as a result of the willful or negligent failure of the children's parent or legal guardian to supervise or protect the children adequately from the conduct of the custodian with whom the children had been left (*id.*, subd. (b)(1)(B)), and by the inability of the parent or legal guardian to

---

[1] Collectively, the children.

[2] Undesignated references to code are to the Welfare and Institutions Code.

[3] "[B]ecause ICWA uses the term 'Indian,' we [may at times] do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1, disapproved in part on another ground in *In re Dezi C.* (2024) 16 Cal.5th 1112, 1152, fn. 18).)

provide regular care of the child due to the parent or legal guardian's mental illness, developmental disability, or substance abuse (*id.*, subd. (b)(1)(D)).  The petition further alleged the children suffered or were at a substantial risk of suffering serious emotional damage evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others as a result of the conduct of the parent or guardian (*id.*, subd. (c)), and the children were left without any provision for support when the children's parent had been incarcerated or institutionalized (*id.*, subd. (g)).

Pursuant to section 300, subdivision (b), the petitions stated mother had been diagnosed with panic disorder and bipolar disorder and was not compliant with her psychotropic medication regimen, resulting in behavior including jumping into traffic, holding a knife to her throat, and threatening to drive off a cliff with the children in the car.  The petitions alleged on July 6, 2022, and on numerous prior occasions, the children were exposed to domestic violence between mother and father, which included yelling, screaming, physical fighting and spitting.  Likewise, the petitions stated mother and father had a substance abuse problem, which they failed or refused to rehabilitate, and mother used excessive corporal discipline.

Pursuant to section 300, subdivision (c), the petitions stated the children were suffering serious emotional damage when, on July 6, 2022, and on numerous prior occasions, the children were exposed to domestic violence between mother and father.  Pursuant to section 300, subdivision (g), the petitions stated on July 6, 2022, mother and father were detained, leaving the children without provisions for care and support.

### *Event Preceding the July 11, 2022 Detention Hearing*

On July 6, 2022, CFS received an immediate response referral alleging emotional abuse, general neglect and caretaker incapacity as to A.B., and general neglect and caretaker incapacity as to H.B. and S.B. by mother and father.  The paternal aunt reported, and father confirmed that he was overdosing on fentanyl, cocaine and Suboxone.  Mother also admitted to using a line of cocaine.  A.B. reported this was not

the first time she witnessed her mother and father use drugs, and she would get scared and did not feel safe. Drugs were also found outside of the motel room where the children, mother and father where staying. Father was transported to a hospital and ultimately both mother and father were arrested.

On July 6, 2022, social service worker (SSW) Button spoke with the paternal aunt C.H., who said father called her stating he was overdosing on fentanyl and to call 911. Mother and father had decided to move to Arizona "'on a whim'" and left all of their belongings behind. While on their way to Arizona, their car was impounded because they had no registration. Mother and father were fearful of CFS because people were aware of their drug use, and had been staying in motels.

Mother and father had a history of drug use, but C.H. believed they had started to use methamphetamine because their behavior was erratic and they had not been caring for the children. Mother had a history of using opiates and had stopped taking her prescribed antipsychotic medication "'cold turkey,'" resulting in her becoming suicidal and threatening to kill herself on a daily basis. Mother had jumped out of the car into traffic while the children were in the car, threatened to drive off of a cliff with the children in the car, and put a knife to her throat in the presence of the children. Mother had been diagnosed with depression and possible bipolar, and father, who used cocaine and fentanyl, was possibly diagnosed with depression, anxiety and attention deficit hyperactivity disorder, but was not prescribed any medication. C.H. felt the children were not safe in mother and father's care.

C.H. stated the children witnessed mother and father yelling, and at times getting "physical." As a result, the children had anxiety. C.H. described S.B.'s anxiety as "'crippling,'" where he would shake and become withdrawn. C.H. also stated the family tried to intervene when mother and father used drugs, such as watching the children while mother and father "went out." But, although the family offered to keep the children,

4.

mother and father would always take them back. In 2016, the family called law enforcement due to father's behavior and he was arrested.

C.H. described mother and father yelling, spanking, and pulling hair on a couple of occasions when disciplining the children. C.H. stated mother and father provided food, water and shelter for the children, and there were generally no concerns for the children's safety until recently.

On July 6, 2022, social services practitioner (SSP) Navarro spoke with mother. Mother stated she and father were arrested for having drugs inside their motel room, and they were all on their way to Arizona to live with a friend. Mother stated she had been using cocaine and tetrahydrocannabinol (THC) daily for a couple of months, but blamed father for the children being removed and the arrest. She stated father had been using cocaine, fetanyl and methadone daily and had been using "'opiates for years.'" Mother did not believe the children saw her and father using drugs, and denied the children could access the drugs.

Mother confirmed she had been diagnosed with a panic disorder and bipolar disorder and prescribed several medications, but had not been taking them for three weeks. Mother also stated she was prescribed hydrocodone for a herniated disc. Regarding the domestic violence, mother stated that father was arrested in 2015 for hitting her and causing bruising, and she had filed for a temporary restraining order. Mother said she allowed the order to expire because father "'[c]onvinced [her] he loved [her].'" Father had an extensive criminal history.[4] Mother stated after she was released, she intended to return to Bakersfield and separate from father.

---

[4] Dating back to 2009, father was convicted of burglary in the first degree, assault on a peace officer with force likely to cause great bodily injury, petty theft, contributing to the delinquency of a minor, probation violation, disorderly conduct for drug or alcohol intoxication, driving with a suspended license, and child cruelty with the possibility of causing injury or death.

On July 6, 2022, SSP Navarro spoke with father. Father confirmed he was using cocaine and fentanyl and called an ambulance because he believed he was overdosing. Father admitted to using drugs while the children were in the motel room. Father stated they were on their way to Arizona to live with relatives, but indicated he wanted to return to Bakersfield once he was released.

On July 6, 2022, SSP Navarro spoke with the children at the police station. H.B. did not have any shoes, and officers were not able to locate shoes for him. H.B. and S.B. were dirty and appeared to not have showered for a few days, evidenced by dirt marks on their arms and legs. SSP Navarro transported the children to SSP Grate-Dixson for temporary custody. En route, H.B. and S.B. stated their parents were arrested for no reason, and they had left Bakersfield to get away from mother's ex-boyfriend who "tried to run them off of the road because he still wants to be with their mother even though she is married." The children reported that they call C.H. when they need help and wanted to stay with her.

Upon arrival, SSP Grate-Dixson interviewed the children. Grate-Dixson attempted to interview S.B., but he stated he did not want to talk and wanted his mother and father. S.B. was unkempt with dirty clothing, no shoes, the bottoms of his feet were black and he had a foul body odor.

Grate-Dixson spoke with H.B., who was also unkempt, with dirty clothing, foul body odor and dirty feet. H.B. appeared nervous and fearful. H.B. stated he did not want to answer questions, and did not see or hear anything as he was asleep. H.B. stated he missed his parents and wanted them to come get him.

Grate-Dixson spoke with A.B., who was also unkempt, with dirty clothing and a foul body odor. She stated the parents had decided to move to get away from mother's boyfriend, who was threatening to shoot father with a gun. A.B. stated the boyfriend was following them the prior night on the freeway and swerving his car into their car, and was

"'obsessed'" with mother.  A.B. stated they were able to get away from the boyfriend and went to a room.

In the room, mother asked father to go into the bathroom while H.B. and S.B. were asleep, but A.B. was awake.  A.B. said father "'has a baggie he carries with him that has white small squares.'"  Father told A.B. it was medicine, but she did not believe him.  A.B. also reported mother and father scream and fight, and "'wrestle'" when they fight— "they are on the ground with each other hurting one another."  When A.B. or her brothers aren't listening the parents have them sit down or they are "'whooped.'"  A.B. denied the parents used a belt or other objects to discipline them.

### July 11, 2022 Detention Hearing

On July 11, 2022, the San Bernardino County Juvenile Court detained the children, finding substantial danger to the physical and emotional health of the children and no reasonable means to protect the children without removal.  The court ordered services for both mother and father, and ordered separate visitation once they were released from custody.

### July 25, 2022 Jurisdiction Disposition Report

On July 16, 2022, supervising SSP Eyasu spoke with father.  Father first inquired about the safety, well-being and location of the children.  Father admitted he struggled with opiates since he was 18 years old, with periods of sobriety followed by relapses.  Father stated he was sober for seven years due to "'methadone, [his] wife, and [his] family.'"  However, one year prior a friend introduced him to fentanyl and he began using it, as well as cocaine.  While in custody he started undergoing Suboxone treatment.

Father stated he and his family left Bakersfield with the hope of getting away from his "influences" and becoming sober.  When discussing July 6, 2022, father stated "'*it was a weird night*, I thought people were following me.'"  At the motel, he thought mother was trying to kill him, and he believed mother laced his fentanyl with cocaine and he was overdosing.  Father stated that he never used drugs in the presence of the children,

7.

but when confronted with A.B.'s comments about him carrying a baggie with white squares, he lowered his head and said nothing for a few minutes. He finally responded that A.B. may have heard him outside the motel. Father admitted he and mother yell and scream in front of the children, but denied any form of physical altercation, even when informed about A.B.'s comments.

Eyasu then interviewed mother. When she met mother, mother began to cry and inquired about the safety, well-being and location of the children. Mother stated she would do anything needed to gain custody of the children again, and this was the longest she'd spent away from the children.

Mother reported the family was traveling to Arizona to get away from her ex-boyfriend and for father to become sober. During their travel, father became paranoid and believed mother's ex-boyfriend was following them. Father was driving with an expired license and was under the influence of fentanyl. Mother commented that father's paranoia was getting worse.

At first mother denied using drugs, but later reported using cocaine earlier in the day. At the motel, father became paranoid and called the police, while mother locked him out and stayed inside the motel with the children. Mother reported she took her psychotropic medication and, afterward, a deputy knocked on the door and completed a sobriety test, which she "passed." Mother said she knew father was going to jail "'*because he had fentanyl and cocaine on him. They found marijuana and a weed pipe on me*.'" Mother stated she had been taking her medication for the past 10 years, as well as hydrocodone two to three times a week for her five herniated disks and scoliosis. Mother believes both the psychotropic medication and hydrocodone had become addictions for her.

Mother reported she only used cocaine "once in a while," when father wanted her to. She began using cocaine three years ago, using it consistently within the last couple of weeks. She stated "'*I did it more because he wanted me to. I wanted to please my*

*husband*.'"  Mother admitted to having a codependent relationship with father, and was open to seeking counseling services to address her behavior.

When asked whether mother or father use drugs in front of the children, mother described one time when A.B. walked out on the porch and saw father smoking something.  Mother stated she "redirected" A.B.  When asked about domestic violence, mother admitted to screaming and yelling, but denied physical altercations.  When asked why the children were filthy, mother reported because they were playing outside before she and father were arrested.

On July 19, 2022, the parents called Eyasu indicating they were released from custody.  Eyasu asked mother about disciplining the children, and mother stated she "'smacks'" them, but denied spitting on them or pulling their hair.  When asked about her mental health, mother admitted to having suicidal thoughts when not taking her medication, but denied attempting suicide.  Mother stated she did attempt to jump out of a moving car after her friend died from an overdose, but father stopped her.  Both mother and father denied mother ever put a knife up to her throat.

### *August 1, 2022 Jurisdiction/Disposition Hearing*

The juvenile court held a jurisdiction and disposition hearing on August 1, 2022.  Mother indicated she may have Native American ancestry through her maternal grandmother, and father and C.H. indicated they did not have Native American ancestry.  The juvenile court dismissed the allegations pursuant to section 300, subdivisions (c) and (g) upon request by CFS, and sustained the allegations pursuant to section 300, subdivision (b).  The court also requested the parents be drug tested and informed the parents that failure to appear for the drug test would be considered a positive test.  The matter was then continued for further ICWA inquiry.

*September 12, 2022 Jurisdiction/Disposition Hearing and October 14, 2022 Transfer Hearing*

The juvenile court held a jurisdiction and disposition hearing on September 12, 2022. At the hearing, C.H. and her husband confirmed no Native American ancestry, and mother indicated she spoke with her mother (maternal grandmother), who confirmed no Native American ancestry. The parents were ordered to participate in family reunification services, including supervised visitation with the children, attendance of a county certified domestic violence prevention program, drug testing and medical and psychological treatment. The matter was then transferred to Kern County.

On October 14, 2022, the Kern County Juvenile Court held a transfer hearing, ordering all prior orders to remain in full force and effect and directed the parents to comply with counseling and services. The juvenile court further ordered Kern County Department of Human Services (the department) to follow up and complete the duty of inquiry in compliance with the ICWA.

*March 10, 2023 Social Study*

On November 11, 2022, Family Social Services Worker (SSW) Mares spoke with mother and provided her with information and resources regarding the classes she was court ordered to take. On December 22, 2022, Mares spoke with mother and father and reviewed their case plan. Both appeared to be taking steps to complete their case plan and mother was working hard to get her children back; she started her parenting classes and was going to mental health appointments with her therapist and medication doctor.

On February 20, 2023, Mares received a progress report for mother, which showed mother had enrolled in domestic violence and child abuse/neglect classes on October 7, 2022, and had attended 13 out of 52 classes. Mother was also attending mental health services, but had not provided proof of enrollment for substance abuse classes.

On February 24, 2023, Mares met with mother and father to discuss their case plan. Mares reminded both parents about random drug testing and encouraged them to

continue to work on their classes. Both parents indicated they were looking for housing. During the review period, mother had submitted to random, unannounced urine drug tests on at least a monthly basis. Mother failed to appear on December 2 and 13, 2022, and on January 17 and 31, 2023. Mother tested negative on February 22, 23, and 27, 2023.

Mares also met with father to discuss his case plan. A progress report received on February 8, 2023, indicated father enrolled in domestic violence and child abuse/endangerment classes on October 7, 2023, and attended five out of 52 sessions. He did not provide proof of enrollment in substance abuse classes. On November 21, 2022, Mares spoke with father, who indicated he was unable to attend the visit with his children because he felt sick. Father submitted drug testing and tested negative on December 22, 2022, and failed to appear to any subsequent drug tests.

The parents were ordered visitation twice weekly for two hours. Mother consistently visited the children during the review period, and father sporadically visited due to his work schedule. Visits went well and no concerns were listed.

On February 24, 2023, SSW Graham spoke with the children and their caregiver, C.H. The home was clean with no visible hazards, and the children stated they enjoyed living with C.H. and were well taken care of. C.H. stated mother and father would fight with one another and talk about their marital problems to the children on comfort calls. C.H. was also concerned mother and father knew how to pass a drug test using synthetic urine and that father had overdosed on fentanyl again two weeks prior. C.H. repeated these concerns to SSW Graham during a phone call on February 27, 2023.

***March 10, 2023 Section 366.21, Subdivision (e) Review Hearing***

On March 10, 2023, the juvenile court held a section 366.21, subdivision (e) review hearing. The juvenile court read and considered the social worker's report dated February 28, 2023, and supplemental report dated March 7, 2023, and found the current plan appropriate and the children's placement necessary. The juvenile court noted both mother and father made minimal efforts to alleviate or mitigate the causes necessitating

11.

placement and minimally availed themselves to services provided to facilitate the return of the children to their care. The court further found substantial evidence that the parents had failed to participate regularly and make substantive progress in court-ordered treatment programs.

Nonetheless, the juvenile court ordered family reunification services to continue to be provided. However, the court advised the parents if physical custody of the children could not be restored within the timeframe allowed by law, proceedings for permanent placement and termination of parental rights may be instituted.

### September 20, 2023 Social Study

On April 21, 2023, Mares spoke with mother and father. Mother indicated she was continuing to work on her case plan and attend her classes. Mares discussed mother's "positive" drug test due to high levels of creatinine and gave her more information on the result. Mother stated visits with the children were going well. Mares then spoke with father, who stated he had been struggling with taking classes due to his work schedule. However, he had been attending some counseling for substance abuse and taking domestic violence and parenting classes and would provide a progress report. Mares asked father about his drug tests coming back positive for fentanyl, and father replied "I am never getting my kids back." Father reported he was always in so much pain because of his injuries to his legs and head, and he got pills from a coworker. Mares told father he could go to his regular doctor to get pain management, and father agreed to make an appointment.

On May 9, 2023 Mares spoke with mother regarding her positive tests for benzodiazepine, and mother provided a prescription for her medication. On May 25, 2023, Mares spoke with mother about her case plan. Mother stated she was excited to complete her parenting classes and she learned she needed to put her children and their safety first. On June 15, 2023, Mares inspected mother and father's home. The home was clean, safe and appropriate. Mother stated father had been seeing a doctor and was

12.

prescribed Suboxone for his substance cravings and was attending one-on-one substance abuse counseling.

On July 3, 2023, Mares had a conversation with mother's healthcare provider about mother's treatment progress. The provider indicated mother only missed one of her appointments, reported that she was "on track" with her substance abuse counseling and denied using substances.

Mother's drug testing results between March 2, 2023, and July 12, 2023, showed a failure to appear on March 2 and 31, May 23, June 9, and July 10 and 12, 2023. Mother tested positive for abnormal creatinine on April 11, 2023, and positive for several prescribed substances on five other occasions.

On July 19, 2023, Mares reviewed a progress report for father, which indicated he attended 17 of 52 domestic violence and child abuse/endangerment classes, and had not provided proof of enrollment for substance abuse counseling. A letter dated June 21, 2023, from father's doctor indicated father had been on medication since October 2021, and "has had tremendous control of his prior substance use disorder." The letter stated father remained actively engaged in care and obtained psychiatric care and behavioral health counseling. Mares was unable to obtain more information about father's progress without father's consent. Between March 29, 2023 and June 30, 2023, father submitted to five random drug tests, each of which tested positive for fentanyl. On April 21, 2023, father also tested positive for cocaine.

On July 20, 2023, Mares informed mother that father would need to move out so that the children could have visits with mother at home. Father stated he would move out by the weekend and stay in a motel until after the next court hearing. Mares did not document any visitation concerns during the reporting period.

On July 26, 2023, SSW Valadez spoke with mother. Mother was crying, stating she just wanted her children back. SSW Valadez stated unfortunately the department did not deem it was safe for the children to go home due to father staying in the home while

13.

testing positive for fentanyl. Mother stated father had "snapped 27 bones" and used fentanyl for pain, and he was given pills from a coworker, which he did not know contained fentanyl. Father only found out the pills contained fentanyl once he started testing positive for it. Mother assured Valadez that father had moved out the prior Sunday.

On August 25, 2023, Mares spoke with mother, who reported she completed her substance abuse, parenting and domestic violence classes and provided a certificate. Mother indicated she spoke with father "off and on." Mares attempted to contact father on August 25, 28, and 29, 2023, but received no answer.

On September 7, 2023, SSW Haddadin spoke with mother, who stated she was working part-time and had completed her case plan. She had separated from father two months prior, and he moved out of the home and was currently living at the paternal grandparents' house. Mother indicated she understood the department's recommendation was to terminate services to her because father did not complete his case plan, was testing positive for drugs and still living in the home. Mother stated she knew the concern was that she was always defending father and "'sticking up for him,'" but she had "learned her lesson" and knows she needs to make "better choices." Mother stated she spoke with father and he continued to support mother and the children financially. She described father as stubborn and hardheaded, with a lot of medical problems, but said "'[I] am not his mom, I am his wife, I did take care of him when he took care of me but I can't do it anymore, I need to be there for my three kids.'" She stated that she was not divorced, but considered herself separated.

When asked what she would do if father came back to the home while her children were in her care, mother said father understood and respected that he cannot be in the home, and "there is no possibility for him coming back to the home." She stated she took his keys and if he did not finish his classes, she would be getting a divorce and would not jeopardize her children again. Mother stated she did not think about getting a restraining

14.

order, but would get one if she needed one to get her children back and understood if she put the children in an unsafe situation they might be removed again.  Mother shared she had been sober and didn't drink.

On September 13, 2023, Haddadin inspected the residence where father was staying, and confirmed father was allowed to stay for as long as he needed.  Between July 13, 2023 and September 5, 2023, father had six drug tests, of which he did not show for five, and tested positive for fentanyl on July 20, 2023.

### September 20, 2023 Section 366.21, Subdivision (e) Review Hearing

The juvenile court held a contested section 366.21, subdivision (e) review hearing on September 20, 2023.  The court adopted the department's modified recommendation, finding mother had "made acceptable effort and availed herself of the service provided to facilitate the return of the children to her care."  The children were placed with mother and family maintenance services were ordered.  The court found return of the children to the physical custody of father would "create a substantial risk of detriment to the safety, protection or physical or emotional well-being of the children."  The court found there was not a substantial probability the children would be returned to father within six months and ordered family reunification services terminated.  Mother was ordered not to be the designee of father's supervised visits.  The next review hearing was set for March 20, 2024.

### December 8, 2023 Supplemental Juvenile Dependency Petition

On December 8, 2023, the department filed a supplemental juvenile dependency petition for more restrictive placement pursuant to section 387.  The petition alleged that on November 27, 2023, father was observed walking up the stairs toward mother's residence, and father's dirty clothing was observed in the home.  Father also stayed the night in mother's home on several occasions and, on one occasion, picked S.B up from school unsupervised.  The petition alleged mother failed to protect the children by

15.

allowing father in the home and allowing unsupervised contact with father placed the children at risk.

The same day, the children were removed from mother's custody pursuant to a protective custody warrant.

### *December 11, 2023 Detentional Social Study*

On October 12, 2023, Haddadin completed an unannounced home visit and spoke with mother. Haddadin discussed mother's missed drug tests, which mother explained were due to her schedule. Mother also said father had not visited, but had attended some of the children's sports practices. Haddadin reminded mother that father was not allowed in the home and if he was found in the home it would jeopardize mother's family maintenance or even close the case, and mother indicated she understood.

On November 27, 2023, SSW Miller completed an unannounced visit to mother's home. Mother opened the door and asked for a few minutes to put the dog away. Miller then observed father walking up to the residence, and a female voice telling him not to come to the residence because Miller was there. Father then turned around and left the apartment complex.

Inside the home, Miller spoke with mother, who said the children had a visit with father on Thanksgiving at C.H.'s house. However, the children do not have a set visitation schedule with father, although they speak with him at least once a day through calls. Miller reminded mother that father is not allowed in the home for any reason, and mother stated he had not been in the home "'at all.'" Miller also discussed mother's recent positive drug test for creatinine, and mother explained she had been drinking a lot of water.

During a walk-through of the house, Miller observed two large piles of clothing that contained dirty men's-sized socks, pants and underwear. Miller then spoke with the children privately. The children indicated they last saw father on Thanksgiving, but speak to him every day over the phone.

On December 1, 2023, Miller spoke with mother regarding father's presence at her house on November 27, 2023. Mother stated she agreed to wash father's work clothing and was going to drop them off at the paternal grandmother's house, but father showed up unannounced. When mother saw him walking up the stairs, she told him to leave.

On December 5, 2023, Miller received a phone call from C.H. C.H. stated Miller should know the truth, and that she "'already knew that [the parents] were lying ....'" C.H. shared that father was "'freaking out'" when he ran into Miller at mother's house, and was afraid the department would remove the children because he was there. C.H. shared that father was "back and forth" between the paternal grandmother's house and mother's house, has a room set up in mother's house and has been staying there. C.H. was also concerned about the children because she was receiving truancy letters and phone calls regarding missed doctor appointments. C.H. stated she had not supervised a visit since the children were returned to mother and, on Thanksgiving, she went to the paternal grandmother's house while mother, father and children stayed home. In early November 2023, C.H. also observed mother, father, and the children visiting the paternal grandmother together.

On December 6, 2023, Miller contacted the children at their school. H.B. stated that on Thanksgiving, mother cooked and his uncles and grandmother came over to the house, but he didn't remember the last time he had a visit with father. He denied father picking him up from school and said he hadn't seen C.H. since moving back in with mother.

S.B. said that on Thanksgiving, mother made dinner and father came over, but C.H. supervised the visit. S.B. shared that father stayed the night at mother's house and slept on the couch. Father had also picked S.B. up from school a week prior.

A.B. said that on Thanksgiving, father, uncle, and grandmother came over, but father did not come inside. A.B. said mother brought father a plate of food outside to his car. When asked if father stayed the night at mother's house, A.B. said "'I don't want to

17.

lie to you, but I also don't want to get taken away from my mom again.'" A.B. said father stayed the night a few days after Halloween and slept on the couch or in the room.

On December 8, 2023, the children were taken into protective custody. Miller informed mother that the children were being removed because mother allowed father in the home. Mother called father and said "'[Miller] is here with the cops and she is taking the kids because of you! I hate you! You're a piece of shit!'" Mother then said she was a good mother and it wasn't her fault father came over without her permission.

On December 11, 2023, Miller notified mother of the initial detention hearing scheduled for the following day. Mother stated she was at the family justice center filing for a restraining order against father and just wanted her children back.

***December 13, 2023 Initial Detention Hearing***

On December 13, 2023, the juvenile court held an initial detention hearing on the December 8, 2023 petition. Mother indicated she re-enrolled in a parenting class and had an appointment with a drug and alcohol rehabilitation program. Mother stated she understood her wrongdoings and requested the children be released to her. Father stated he realized his lapse in judgment and was willing to stay away from mother's home. The children also indicated they wanted to go home with mother—there were only two times father came over and there was no domestic violence.

The juvenile court indicated that the problem it had was the parents lied and also encouraged the children to lie. The juvenile court found, when the court awarded family maintenance in September, mother was well aware of the lack of progress father made, and still allowed him into the home, lied to the social worker, created a very detailed lie about what happened at Thanksgiving, about the clothes in the hallway—the court indicated it did not trust mother. The court further commented because of the parents' selfishness and dishonesty, the children had to be removed and were being punished despite having done nothing wrong.

18.

The juvenile court detained the children from mother, and noted "the most tragic part about this case is our two-two date is January 6th, [2024,] so we are effectively out of time."[5]

### *January 29, 2024 Social Study*

On December 14, 2023, SSW Valadez received a call from mother. Mother was crying and stated that father sent her screenshots of text messages in which C.H. was denigrating her. Father told her he was trying to get someone in his family to adopt the children and mother would never see them again. Mother said she called the cops because father was circling her neighborhood and would not leave her alone. She said she just wanted him out of her life and to have her children back. Valadez said that no one had applied for placement, and mother should focus on her case plan and finalizing the restraining order. Mother sent Valadez screenshots of the text messages between father and C.H.

On January 12, 2024, Valadez spoke with mother and informed her that she was given 18 months of family reunification services and she no longer had any time left. Mother indicated she was continuing voluntary classes, was working and father indicated he would continue to help her pay rent. When asked about a restraining order, mother stated she didn't have the money to file for one, because father was never physically abusive with her and never threatened her life. When asked about drug testing, mother stated the most recent test she had a urinary tract infection and could not give a sample, despite trying for 10 minutes.[6]

---

[5]    The "two-two" date is in reference to section 366.22, the permanency review hearing that determines whether a child is returned to the custody of the parent or guardian.

[6]    A record of mother's drug tests shows mother failed to appear on December 15 and 19, 2023, and on January 4, 2024, the record notes "Unable to provide—Client arrived five minutes before closing and stated she could not give a sample."

*January 29, 2024 Jurisdictional/Dispositional Hearing*

The juvenile court held a jurisdictional and dispositional hearing on January 29, 2024. Mother testified that she re-enrolled in classes and counseling. She also planned to file for divorce and attempted to file a restraining order. Mother admitted to being dishonest and stated she would not allow father to come near or around the children unless supervised or he is sober. Mother stated she did not intend to re-enter into a relationship with father.

Over the department's objection, the juvenile court returned the children to mother's custody with continued family maintenance. The court commented on how mother re-enrolled in classes and continued with her counseling, admitted to being selfish and indicated she wanted to change. The court concluded "I cannot be more clear. If you let [father] even at the door to say hi, I will remove these kids. I will remember everything you say and I will not give you a second chance."

*July 29, 2024 Social Study*

On March 4, 2024, SSW Miller attempted to make an unannounced vist with mother and children at their home, but no one answered the door. As she was leaving, Miller observed father leaving the residence. Miller then called mother, who said she was not home and father was "currently giving her a ride to one of her classes." Miller stated she observed father leaving the residence and did not see anyone in the passenger seat. Miller reiterated father was not to be around her home under any circumstances.

Miller then asked where the children were. Mother stated they were with the maternal grandmother and gave Miller the grandmother's contact information. Approximately 20 minutes later, Miller received a text from mother stating "'I just talked to my mom she just told me she had their papa pick them up because she was sick so they are at their nana and papas [*sic*] … I wasn't aware of this at all .…"

On March 7, 2024, Miller spoke with C.H., who said the parents had been "'following the rules this time around as far as [she knew].'" On June 7, 2024, Miller

20.

completed an unannounced visit to mother's home. A.B. was staying the night with C.H. and was not at home.

Miller spoke with H.B., who said he liked living with mother. He said he couldn't remember the last time he met with his therapist and hadn't attended therapy in a long time. H.B. said he talked with father every day by video call, but hadn't seen him since the last visit.

Miller then spoke with S.B., who also shared that he hadn't met with his therapist in a long time. He also spoke with father every day by video call, but hadn't visited with father in a long time and missed him. Miller then spoke with mother. Miller commented how the children's grades and attendance had declined after they returned to mother's care. Mother assured Miller that she would make sure the children got to school on time every day. Mother stated she intended to move out-of-state if the case was dismissed at the following hearing.

Miller discussed the children's mental health services and commented that the children's mental health should be a priority. Mother said that A.B. had met with her therapist the prior week, and the children had an appointment scheduled yesterday, but missed it due to a sleepover. Miller also noted mother had poor attendance in her classes, and mother said she had to miss classes due to not having childcare. Mother also had a positive drug test for creatinine on May 24, 2024, and mother said she drank a lot of water that day. She agreed to give a sample to Miller that day.

On March 8, 2024, Miller met with the children at their school. Upon arrival, the school receptionist informed Miller that mother had just left the school and that she "'coached'" the children on what to say. Miller spoke with A.B., who said her mom told her Miller would be coming to school to ask her some questions about father and told A.B. to tell the truth. A.B. said she was sitting next to mother when mother got the phone call about father leaving the residence, and mother was scared because she did not want the children to be taken away again. A.B. said the last time she saw her father was the

21.

last supervised visit they had. A.B. also said they might be going to Disneyland soon with mother, father, C.H. and her children.

Miller spoke with H.B., who said the last time he saw father was during their last supervised visit, and father had not been to mother's house "'at all.'" H.B. said mother told him Miller would be speaking with him and told him to tell the truth. Miller spoke with S.B., who stated that he did not remember the last time he saw father in person but talks to him by video call every day.

On March 16, 2024, Miller completed a visit to mother's home and spoke with paternal aunt Ashley B. The aunt gave permission to enter the home, and said mother was at the laundromat. When Miller spoke with A.B., however, she said that mother was staying the night with father at the grandparents' house. H.B. said that mother went to the grandparents' house to wash clothes. S.B. said that mother went to the grandparents' house to spend time with father.

Miller noted the house was messy, with piles of clothes throughout and old food on the stove, counters and dining room table. The aunt said that mother was 10 minutes away, and Miller waited for mother to arrive. Upon arrival, mother stated that she was upset when law enforcement showed up to her house for a welfare check the prior weekend. Miller stated that she was concerned after witnessing father leaving the residence.

Mother said she would ask paternal aunt to watch the children overnight a few times while she stays with father. Sometimes, she would stop by father's home to spend time with him after dropping the children off at school. On March 18, 2024, Miller contacted mother's "learning to protect" class facilitator, who informed Miller mother was dropped from classes due to exceeding the amount of unexcused absences. Mother re-enrolled on March 25, 2024 and had completed 10 out of 26 classes.

On June 26, 2024 and June 27, 2024, SSW Lopez attempted to make contact with mother at her residence, but no one was home. Lopez reached out to C.H. and obtained

22.

mother's recent contact number. C.H. commented that mother changed phone numbers often because she tended to have "'throw away phones.'" Lopez was able to call mother, who said she was out of town with maternal grandmother and the children for the weekend.

On July 1, 2024, Lopez met with mother and children in mother's home. The children all reported enjoying living with mother, each had clean clothes, although the bottoms of their feet were dirty and the house was messy. A.B. reported being paid to go to C.H.'s house to help C.H. with her newborn. The children all reported they had not had in-person contact with father in a while.

On July 10, 2024, SSW Miller attempted to make contact with mother and children, but no one was home and mother did not answer her phone. Miller left her card in the screen door. On July 13, 2024, SSW Zepeda attempted to make contact with mother, but mother and children were again not home. Zepeda instead made contact with mother's sister, who said mother would return shortly. Zepeda asked mother's sister to have mother call when she returned. Zepeda also attempted to call mother's phone, but there was no answer.

On July 18, 2024, SSW Miller made telephone contact with mother. Mother had tested positive for cocaine and additional substances on July 1, 2024. Mother stated she had relapsed due to her cousin committing suicide. The children were with her mother when she used. Further, father's prescription was found in mother's home, and mother admitted to taking father's prescription. Mother admitted the positive test would not look good in court, but commented that "'I'm not perfect and it's not like I'm an addict.'" Regarding father's prescription, mother stated that it was for acid reflux and was in her home "'since he was here.'"

### *July 29, 2024 Review Hearing*

On July 29, 2024, the juvenile court held a section 364 review hearing. The juvenile court found conditions still exist which would justify the initial assumption of

23.

jurisdiction over the children. The court found clear and convincing evidence that mother failed to participate regularly in court ordered programs, and reasonable services had been provided and offered to mother. Nonetheless, the court ordered family maintenance services to continue and for mother to comply with the family maintenance plan.

### August 13, 2024 Supplemental Juvenile Dependency Petition

On August 13, 2024, the department filed a supplemental juvenile dependency petition alleging the previous disposition has not been effective in the protection of the children. The petition alleged on February 12, 2024, H.B. reported that father met with the children at urgent care the prior night and stayed for about 30 minutes. Mother indicated she thought it was okay for father to be there. On March 4, 2024, father was observed leaving mother's residence. On March 16, 2024, mother stated she spent time with father while the children were in school, and stayed the night with father at his residence. On August 5, 2024, A.B. reported to have seen father on July 3, 2024, at her grandfather's home.

The petition further alleged that mother tested positive for cocaine on July 1 and 27, 2024. Mother tested positive for cannabinoids on July 17, 2024. Mother failed to appear for testing on January 28, March 26, April 12, April 18, May 17, June 10, and June 14, 2024. On July 18, 2024, mother reported taking medication prescribed to father. On August 7, 2024, mother denied drug use and stated she had not used since June 2024.

### August 14, 2024 Detentional Social Study

On February 12, 2024, SSW Hernandez spoke with H.B., who revealed father had met with the children the prior night and stayed for about 30 minutes. Mother indicated that she thought it was okay for father to be there.

On August 5, 2024, SSW Miller met with mother and children at mother's house. A.B. said that she had seen her father at her grandfather's house on July 4, 2024, "'But my Aunt [C.H.] was there, too.'" On August 7, 2024, SSW Miller spoke with mother on the phone to discuss mother's positive drug test. Mother tested positive for

24.

benzodiazepine and cocaine on July 27, 2024.  Mother stated she wasn't sure how she tested positive because she had not used cocaine since June 2024.

On August 12, 2024, SSW Miller spoke with mother about the unsupervised visit between father and the children on July 4, 2024.  Mother stated that C.H. invited them to the paternal grandfather's house, and father appeared in a separate vehicle.  Mother believed it was okay because C.H. was there, and because she had asked SSW Miller for permission ahead of time.  SSW Miller stated that she had not given permission for C.H. to supervise a visit.  Mother said she had taken the children to C.H.'s house in the past and father showed up, so she "'just assumed'" it was okay.

### August 21, 2024 Supplemental Petition Detention Hearing

On August 21, 2024, the juvenile court held a continued supplemental petition detention hearing.  The court ordered the children remain detained.  Mother testified, but the juvenile court did not find her testimony to be credible.  The court found:

> "What's really disappointing is that this is the second [section] 387 [hearing], with a lot of the similar issues.  And in fact, at the last dispositional hearing, the recommendation from the department was to place the kids in a planned permanent living arrangement, and the mother had testified in that dispositional hearing, and I have the notes from that.  And a lot of the same things she said on that date, she's saying today.
>
> "I just feel, in a lot of sense, we're in the same position we were at the disposition, … I don't find her credible—her testimony to be credible.  I don't see how you use cocaine at the end of June and still test positive on July 27th.
>
> "Further, regarding her reason about the July 4th visit, it's contrary to what she said on August 12th to social worker Miller .…  Again, with having the unauthorized access of the father to the children … what was unclear because we had a whole court hearing, and the children were going to go on a permanent planned living arrangement, meaning long term foster care, because of that unauthorized access.
>
> "And when I read the report—and I wasn't here for the [section] 364 hearing that happened a couple of weeks ago—it baffles me that [mother] was still unclear as to what kind of access the father had to the children.

All access had to be through the department. I could not have been more clear at the dispositional hearing regarding that.

"When I read the detention report, and I see the petition, it was beyond disappointing to this Court to see what has happened. It's beyond disappointing because it is the children who are suffering, and I've had this conversation with both of you before. And it continues to be disappointing because they are the ones who are hurting, and they are the ones who are being affected by all of this.

"I really believed you … when you had testified at the last dispositional hearing, and it was very disappointing to see everything that has happened since. Because, to me, I took a chance, against the department's recommendation, and it did not work out.

"And it didn't work out, not because there is miscommunication. It didn't work out because you didn't follow through on your promises to this Court. And now I'm forced in the position to, again, remove these children for a third time from you, and it's not fair to them."

***October 9, 2024 Contested Jurisdiction/Disposition Hearing***

On October 9, 2024, the juvenile court held a contested jurisdiction and disposition hearing. Mother contested the department's recommendation and testified that SSW Miller had given her verbal confirmation father could visit on July 4, 2024.

The court ruled:

"These are the things that stood out to me. In the last [section] 387 [hearing] on December 14th, the mother said to the social worker, she stated she wanted [father] out of her life and just wanted her children back. She indicates that she was going to get a restraining order.

"In her testimony at the last hearing, at the second [section] 387 [hearing] in January, she indicated that she was going to file for a divorce. She was going to get a restraining order. That testimony was on January 29th, 2024.

"And then, about 46 days later, she indicates that she is having contact with him, spending the night with him. 'While the kids are with [mother], spends time with [father] after she drops them off.' That's on March 16th, 2024.

"I think [mother] says what she thinks she needs to say to this Court and does something completely different.

"Today she said it was a moment of weakness; the kids are worth it; she's stronger than that; they are her babies. In January of this year, she said she felt selfish; she feels wrong; she doesn't want to be that person; she was scared; she didn't want to lose the kids; she wanted them to keep her adolescence. It's the same thing over, and over, and over.

"And the last time that I gave her family maintenance, after the second time I had removed them, I could not have been more clear. I said if the father comes to the door, I will remove these kids. I could not have been more clear. I have been painted into a corner because you guys cannot get it together. You continue to minimize what was told to you by this Court. You continue to make excuses as to why the father is still in your life. You continue to make excuses as to why you test positive for cocaine. There has been no ownership, no responsibility.

"And what kills me is that these children love you so much. And I wish I can send them home, but I have no doubt that if I were to send them home with you today, they will be removed a fourth time. These kids see you as perfection, and they love you with every fiber in their being, and I wish I had a different outcome, but at this point, based on the evidence in front of me, I would be going against every fiber in my being as to what would be safe for them.

"The other things that this Court took into consideration is that when the children were returned to the mother, they stopped attending school regularly, their grades had declined significantly. The children had stopped going to therapy for a long amount of time.

"What I noted is that when the mother said, [on] March 16th of 2024, that she was spending the night with the father, hanging out with the father, that is also when she stopped testing regularly for the department.

"All of these facts and all of this evidence, I cannot ignore, because if I were to ignore that, I would be putting the children in a situation that is unsafe, unfair, and we would be back where I have to remove them for the fourth time. If I were to compare the transcripts from January of this year to today, they would almost be identical, even in argument from minor's counsel.…"

The court ordered the children remain dependents of the court, and placed the children in the care, custody and control of the department for suitable home placement.

27.

The court found by clear and convincing evidence there was, or would be, a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if the children were not removed from the physical custody of the parents, and there are no reasonable means to protect the children absent removal. The court noted the children come within section 361.5, subdivision (a)(3), and mother had received over 18 months of family reunification services. The court terminated services to mother. The parents were ordered supervised visits twice weekly.

## DISCUSSION

**I.**  **Substantial Evidence Supports the Juvenile Court's Finding That Removal Was Necessary to Protect the Children's Physical or Emotional Well-being**

Mother argues there was no evidence father was under the influence of drugs at the time of unauthorized contact with the children, and the department did not detail any serious risk of harm by father's contact with the children. Mother also argues that there is no evidence her positive drug tests in July 2024, posed any substantial, continuing risk of harm to the children at the time of the dispositional order. We find substantial evidence supports the juvenile court's October 9, 2024 removal order.

### A.    Legal Standard

A dependent child shall not be taken from the physical custody of their parents or legal guardians, unless the juvenile court finds clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's, guardian's, or Indian custodian's physical custody.…" (§ 361, subd. (c)(1).)

A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. (*In re Jeannette S.* (1979) 94 Cal.App.3d 52, 60.) The parent

28.

need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)

"'[O]n appeal, the substantial evidence test is the appropriate standard of review. Thus, in assessing this assignment of error, "the substantial evidence test applies to determine the existence of the clear and convincing standard of proof .…" [Citation.]'" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

"In reviewing the sufficiency of the evidence, our review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders. [Citation.] Those findings and orders may not be disturbed if they are supported by substantial evidence. [Citations.] … 'Issues of fact and credibility are questions [of fact] for the trial court, not this court. [Citation.] "The rule is clear that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." [Citation.]'" (*In re Samkirtana S.* (1990) 222 Cal.App.3d 1475, 1487.)

**B.     Analysis**

The children having unsupervised contact with father created a substantial danger to their physical health and safety due to father's fentanyl use. Mother argues there was no evidence father was under the influence of drugs when he came into unsupervised contact with the children. However, the parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. (*In re Jamie M., supra*, 134 Cal.App.3d at p. 536.)

Father had last tested positive for fentanyl on July 20, 2023, and since father's reunification services were terminated on September 20, 2023, no facts were presented that indicated father was sober. While father was receiving family reunification services, he made minimal progress addressing his substance use and repeatedly tested positive for

fentanyl. Mother defended father's positive drug tests, stating that father was not aware the pills he was taking contained fentanyl, and only found out the pills contained fentanyl when he started testing positive for it. Father tested positive for fentanyl as early as March 29, 2023, and last on July 20, 2023, a period of almost four months. He acknowledged his positive drug tests to SSW Mares on April 21, 2023. If, as mother argued, he only found out about the fentanyl in his pills when he started testing positive for it, the record shows father nonetheless continued to take those pills, or some other form of fentanyl, until at a minimum July 20, 2023. Taken together, it is reasonable for the juvenile court to infer father continued to use fentanyl between September 2023 and October 2024, and father's repeated, unsupervised access to the children posed a risk to the children's physical safety.

Mother argues the department failed to articulate specific reasons why or how the children would be at risk should father have contact with the children after placement with mother, relying on *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646 (*M.G.*). In *M.G.,* the mother had a history of substance abuse and domestic violence between her and her boyfriend, P.B. (*Id.* at p. 650.) Thirty-four months after the children's initial removal, the mother was maintaining her sobriety and having a peaceful relationship with P.B. (*Id.* at p. 654.) Nonetheless, the juvenile court found detriment. (*Id.* at p. 661–662.)

The appellate court ruled substantial evidence did not support the juvenile court's finding, noting that the juvenile court had no specific concerns with the parents' substance abuse and there was no evidence indicating the mother's relationship with P.B. was concerning. The juvenile court had "based its concerns on a hunch that was not supported by any evidence, stating [the] Mother's relationship with P.B. was 'a risk to you and your sobriety.'" (*M.G., supra*, 46 Cal.App.5th at p. 662.)

In this case, the juvenile court's finding is not based on a "hunch." (*M.G., supra*, 46 Cal.App.5th at p. 662.] The record shows on at least two occasions when father was using fentanyl, he became paranoid and engaged in dangerous behavior. Prior to the

children's initial detention, father drove while under the influence of fentanyl, and his behavior led the children to believe that mother's ex-boyfriend was "following" them and "tried to run them off the road." He then believed mother laced his fentanyl and was trying to kill him by causing him to overdose. The record shows father has not maintained his sobriety, therefore unsupervised contact between him and the children potentially exposes the children not only to the drugs, but also to dangerous behaviors that create a substantial risk to their physical safety and emotional well-being.

Finally, unlike in *M.G.*, mother in this case failed to maintain her sobriety and failed to adequately care for the children. The record shows mother tested positive for cocaine on July 1 and 27, 2023. Mother minimized this drug use, stating she did not know how she tested positive on July 27, 2023. Mother then commented that the positive tests would not look good in court, but "'it's not like I'm an addict.'" In addition, the children's grades and attendance declined after they returned to mother's care and mother neglected the children's mental health by failing to take them to their appointments with their therapist, opting instead to take them to a sleepover. Mother argues these deficiencies and the risk of continuing harm from mother's use of cocaine was too vague to justify the "drastic" consequence of removal. Taken together, these lapses in the children's care constitute substantial evidence in support of the juvenile court's removal order.

## II. Reasonable Services Were Provided to Prevent or Eliminate the Need for Removal

Mother presents an argument in two parts. First, mother argues the department did not offer her reasonable services. Mother then argues the department did not make reasonable efforts to prevent the removal of the children from her custody and reasonable means existed that would have prevented the need for removal. We find substantial evidence supports the juvenile court's finding there were no reasonable means by which

31.

the children's physical health can be protected without removing the children from mother's physical custody.  (§ 361, subd. (c)(1).)

## A. Legal Standard

A dependent child shall not be taken from the physical custody of their parents, unless there is clear and convincing evidence there are "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents .…"  (§ 361, subd. (c)(1.)  Further, "[t]he court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from their home .…"  (*Id.*, subd. (e).)  We review the juvenile court's finding there were no reasonable means for substantial evidence.  (*In re Henry V., supra*, 119 Cal.App.4th at p. 529.)

Distinct from the reasonable means analysis is the question of whether a parent received reasonable services.  "At each review hearing, the court is required to determine the 'extent of the agency's compliance with the case plan' in making reasonable efforts to return the child to a safe home.  [Citations.]  Services 'may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children.'"  (*In re A.G.* (2017) 12 Cal.App.5th 994, 1000–1001.)

"To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult .…'"  (*In re A.G., supra,* 12 Cal.App. 5th at p. 1001.)  Reunification services should be tailored to the particular needs of the family, and the "'adequacy of reunification plans and the reasonableness of the [department's] efforts are judged according to the circumstances of each case.'"  (*Ibid.*)

"'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.'" (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1159.) We review a challenge to the adequacy of reunification services for substantial evidence. (*Id.* at p. 1158.)

### B.    Analysis

### *Forfeiture*

Insofar as mother challenges the adequacy of the reunification services offered, the challenge is forfeited. "Many dependency cases have held that a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court. [Citations.] As some of these courts have noted, any other rule would permit a party to trifle with the courts. The party could deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338–1339.)

The forfeiture rule is not absolute, but "application of the rule has only been found inappropriate on due process grounds when an error so 'fundamentally undermined the statutory scheme' that the parent was prevented from availing himself or herself of its protections. [Citation.] Moreover, 'defects must go beyond mere errors that might have been held reversible had they been properly and timely reviewed.'" (*In re T.G.* (2015) 242 Cal.App.4th 976, 985.)

We find forfeiture applies to the question of whether mother received reasonable services, as neither the court nor the department were put on notice that reunification services were inadequate, even though mother had multiple opportunities to make such an objection. Thus, mother's argument that reunification services were inadequate is an attempt to raise a new issue on appeal that was not presented to the juvenile court, and the issue is forfeited.

***Reasonable Means***

We turn to whether substantial evidence supports the juvenile court's finding that there are "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents .…" (§ 361, subd. (c)(1.) On October 9, 2024, the juvenile court found "[t]he department has complied with the case plan by making reasonable efforts and providing reasonable services to prevent or eliminate the need for removal of the children from the home and to make it possible for the children to safely return home .…" Mother argues the department's efforts were not reasonable and reasonable means exist that could have allowed the children to remain in mother's custody.

When services were terminated on October 9, 2024, mother had received over two years of combined predisposition and family reunification services.[7] Mother received at least 18 months of family reunification services, including access to mental health services with a psychological medication evaluation and counseling, a substance abuse program and drug testing, a domestic violence prevention program, and parenting classes. Mother had previously completed and then re-enrolled into several of these classes.

Mother also disavowed her relationship with father on multiple occasions, going as far as seeking out a restraining order and stating she intended to file for divorce. She specifically told the juvenile court on January 29, 2024, that she intended to file for divorce, would not allow father to come near or around the children, and did not intend to re-enter into a relationship with father.

Nonetheless, mother chose to continue to allow father access to the children, including in her own home and in the children's grandparent's house, and continued to have a relationship with father. On March 3, 2024, despite being warned by the court of

---

[7] Predisposition services were first ordered on July 11, 2022, at the first detention hearing, and ordered continued by the Kern County Juvenile Court following transfer proceedings on March 10, 2023.

the consequences of allowing father near her home and the children, father was again seen in mother's home. When confronted about it, mother lied about her and father's whereabouts. Father's prescription medication was found inside the home, and mother admitted to taking it.

And while mother explained her own missed classes due to not having childcare, she gave no reason for the children's poor school attendance. Her explanation why the children did not attend their scheduled therapy session was that they had a sleepover, and while that explained the most recent missed appointment, mother did not state why the children had not seen their therapist, as H.B. and S.B. described, "in a long time."

Mother argues the department could have sought a restraining order against father or arranged for mother to enter a domestic violence shelter or family residential treatment facility with the children. Mother argues the department could have also sought further assessments from mother's psychiatrist in July, when she relapsed and tested positive for cocaine. Mother finally asserts the department could have obtained tutoring for the children and secured transportation to their therapy appointments.

The record shows mother made detrimental choices which placed the children's physical and emotional well-being at risk, such as continuing a relationship with father and allowing father unsupervised access to the children, despite clear warnings from the juvenile court that such behavior would result in the children's removal. Mother completed substance abuse and parenting classes, but despite that, mother continued to minimize and lie about her substance abuse, such as stating she did not know how she tested positive for cocaine on July 27, 2024. Mother continued to coach the children regarding what to say to social workers, and failed to continue the children's therapy, prioritizing sleepovers over the children's appointments.

The department's efforts need only be *reasonable*. In light of mother's actions despite years of reunification services, classes, and promises made to the juvenile court, and due to mother's continuous attempts to obfuscate her harmful actions, it is unclear

what reasonable efforts the department could conceive to keep the children from harm, other than removal. The juvenile court's October 9, 2024, finding by clear and convincing evidence that no reasonable means exist by which the children's physical health could be protected without removal is supported by substantial evidence.

## III. The Juvenile Court Did Not Err When Denying Further Reunification Services

Mother argues the juvenile court should have set an additional period of services pursuant to section 366.3, subdivision (f). We find the juvenile court did not abuse its discretion terminating reunification services.

### A. Legal Standard

Section 361.5, subdivision (a)(1)(A) generally directs a juvenile court to provide family reunification services for a period of 12 months following the date of initial removal from the physical custody of the child's parent or legal guardian. These court-ordered services may be "extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent or guardian if it can be shown, at the hearing held pursuant to subdivision (f) of Section 366.21, that the permanent plan for the child is that the child will be returned and safely maintained in the home within the extended time period." (*Id.*, subd. (a)(3)(A).)

A court may only extend the time period not to exceed 18 months "if it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent or guardian within the extended time period, or that reasonable services have not been provided to the parent or guardian." (§ 361.5, subd. (a)(3)(A).)

A court may only extend the time period not to exceed 24 months "if it is shown, at the hearing held pursuant to paragraph (1) of subdivision (b) of Section 366.22, that the permanent plan for the child is that the child will be returned and safely maintained in the home within the extended time period." (§ 361.5, subd. (a)(4)(A).)

36.

When a juvenile court orders a permanent plant of adoption or legal guardianship pursuant to section 360 or section 366.26, "[i]t shall be presumed that continued care is in the best interests of the child, unless the parent or parents prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child. In those cases, the court may order the parent or parents be provided further reunification services, for up to a period of six months, and family maintenance services, as needed for an additional six months, to return the child to a safe home environment." (§ 366.3, subd. (f).)

"When the court later considers a subsequent petition alleging additional bases of dependency jurisdiction, further reunification services are not required in all cases. Failure to order additional reunification services after finding jurisdiction on a subsequent petition constitutes reversible error only if the particular facts of the case demonstrate an abuse of discretion in failing to order additional services." (*In re Barbara P.* (1994) 30 Cal.App.4th 926, 934.)

### B. Analysis

On October 9, 2024, the juvenile court found by clear and convincing evidence the children came within section 361.5, subdivision (a)(3), and that mother had received over 18 months of family reunification services. The court did not set a section 366.26 permanency hearing, but set the matter for a relative placement hearing and indicated if the children were placed, the court would consider setting a section 366.26 hearing at that time.

Mother argues the juvenile court had a sua sponte duty to consider her eligibility for reunification services under section 366.3, relying on *In re R.N.* (2009) 178 Cal.App.4th 557 (*R.N.*) and *D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017 (*D.T.*). In *R.N.*, in postpermanency proceedings following the death of the child's guardian (her grandmother), the father filed a section 388 petition arguing the child should be placed

with him, in contest to a section 388 petition by the father's sister. (*R.N., supra*, at pp. 562–563.) The juvenile court summarily denied the father's petition. (*Id.* at p. 563.)

The appellate court found the denial in error, because the juvenile court failed to offer the father the considerations required by section 366.3, subdivision (f). (*R.N., supra*, 178 Cal.App.4th at p. 566.) "Section 366.3 is implicated not only by petitions to terminate a guardianship, but by petitions to modify a prior guardianship order by, among other things, appointment of a successor guardian. Section 366.3's express provisions embody the Legislature's policy determination that, when a change in a guardianship is made, the dependency court must provide notice to parents, consider and evaluate possible custody solutions, and consider whether to provide reunification services." (*Ibid.*)

The appellate court in *D.T.* noted "[t]he question presented here is whether section 366.3, subdivision (f) should also have been applied when the [department] filed a supplemental petition seeking to remove the children from a *parent's* home after she had exhausted entitlement to services under section 361.5 and postpermanency planning was well underway." (*D.T., supra*, 241 Cal.App.4th at p. 1040, fn. omitted.) The appellate court concluded "that borrowing the reunification services provision of section 366.3 for that purpose most closely corresponds to the legislative intent underlying the statutes," but expressed no opinion on whether the courts must consider such eligibility sua sponte. (*Ibid.*)

However, unlike in *R.N.* and *D.T.*, this case is not in the postpermanency planning stage. Section 366.3 specifically addresses postpermanency proceedings where the presumption is "that continued care is in the best interests of the child …." (*Id.*, subd. (f).) Reunification services in this pre-permanency but postremoval stage such as in this case would most closely be governed by section 361.5, subdivision (a)(4)(A), which allows for services to be extended up to 24 months after the date the child was originally removed from physical custody if the juvenile court finds "(i) it is in the child's

best interest to have the time period extended and that there is a substantial probability that the child will be returned to the physical custody of the child's parent or guardian who is described in subdivision (b) of Section 366.22 within the extended time period" or "(ii) reasonable services have not been provided to the parent or guardian .…" (*Ibid.*)

Second, even if section 366.3, subdivision (f) were to apply, the statute requires the parent to "prove, by a preponderance of the evidence, that further efforts at reunification are the best alternative for the child." In *R.N.*, the father filed a section 388 petition (*R.N., supra*, 178 Cal.App.4th at p. 563) and, in *D.T.*, the mother requested a contested hearing on the issue of reunification services (*D.T., supra*, 241 Cal.App.4th at p. 1040). In this case, mother requested family maintenance, and argued that the difference at the October 9, 2024, hearing was she was able to "fully verbalize insight into her codependency" with father. Mother did not present any evidence that further reunification was "the best alternative" for the children as required by section 366.3, subdivision (f), or that reunification services were "in the child's best interest" and there was a "substantial probability" the children would be returned to her physical custody as required by section 361.5, subdivision (a)(4)(A). The juvenile court did not abuse its discretion when it terminated mother's family reunification services.

## C. The Challenge to the ICWA Inquiry is Premature

Mother argues the department failed to comply with California's ICWA inquiry and noticing requirements pursuant to section 224.2, subdivision (i)(2). We find the issue premature, as the juvenile court has not made a final ICWA finding.

## D. Background

On September 1, 2022, pursuant to section 224.2, the San Bernardino County Juvenile Court asked both parents whether they had any Native American ancestry. Father indicated he had no Native American ancestry. Mother stated the children's maternal great-grandmother was Native American. Mother said the children's maternal great-grandmother passed away when she was nine months old, and maternal

grandmother would have more information.  Mother did not know which tribe maternal great-grandmother belonged to.  C.H. was also present and denied Native American ancestry.  Both parents filled out a parental notification of Indian status form (Judicial Council Forms, form ICWA-020), and both parents indicated no Native American ancestry on the form.

On September 4, 2022, SSP Eyasu spoke with maternal grandmother, who confirmed no Native American ancestry over the phone.  On September 12, 2022, the juvenile court conducted further ICWA inquiry.  The juvenile court questioned C.H. and her husband, who both denied Native American ancestry.  CFS informed the court it tried to contact mother's sister (maternal aunt) and father's mother (paternal grandmother), who had not responded.  CFS stated "we do not have anyone naming a tribe or indicating any other affiliations."  The juvenile court ruled there as no reason to believe and no reason to know the children were Indian children pursuant to the ICWA.

At the transfer hearing on October 14, 2022, the department indicated concern regarding the ICWA inquiry conducted in San Bernardino County.  The Kern County Juvenile Court directed the department to follow-up and complete the duty to inquire in compliance with ICWA.

On February 27, 2023, SSW Arredondo spoke with mother and father, who both stated there was no Native American ancestry in their families.  SSW Arredondo attempted contact with maternal grandmother, paternal aunt Ashley B., paternal grandmother, and paternal grandfather, but was not successful.  SSW Arredondo contacted maternal aunt Lisa D., and C.H., who both stated they did a DNA test and reported no Native American ancestry.

On December 14, 2023, SSW Arredondo mailed "AB938 letters," "JV285 form[s]," civil rights pamphlets and "Important Information" to the children's paternal relatives.  SSW Arredondo spoke with father and C.H., who confirmed no Native

American ancestry in the family.  SSW Arredondo attempted to contact mother, but was unsuccessful.

On August 14, 2024, SSW Arredondo received permission from the court review social worker to start family finding services and Native American ancestry inquiry on behalf of the children.  SSW Arredondo mailed "AB938 letters," "JV285 form[s]," civil rights pamphlets and "Important Information" to the following maternal relatives: grandmother, one great uncle, four great aunts, two uncles, two aunts, and 10 cousins. SSW Arredondo sent the same to the following paternal relatives:  great-grandmother, grandmother and grandfather, two aunts, one uncle, and one cousin.  The record does not reflect whether the documents sent contain an ICWA inquiry or similar form.

On August 15, 2024, SSW Arredondo spoke with paternal grandmother, who denied Native American ancestry.  He also spoke with C.H., who again denied Native American ancestry.  He spoke with maternal uncle, who indicated he did not know whether there was any Native American ancestry in the family.  SSW Arredondo attempted to speak to maternal grandmother and maternal aunt Lisa R., but was unsuccessful.

At the October 9, 2024 hearing, the juvenile court did not make any findings as to whether the children are Indian children as described by ICWA.

### E.    Legal Standard

Very recently, faced with continuing difficulties and inconsistencies in this area of the ICWA, the Legislature enacted Assembly Bill No. 81 (2023–2024 Reg. Sess.), effective September 27, 2024.  Assembly Bill No. 81 "create[d] a comprehensive act to protect and preserve Indian families in California and to aid in improving implementation of applicable state and federal laws."  (§ 224, subd. (c).)  The legislation expressly recognized, "Despite the passage of the federal Indian Child Welfare Act of 1978, Senate Bill [No.] 678 (Stats. 2006, Ch. 838), and Assembly Bill [No.] 3176 (Stats. 2018, Ch. 833), California continues to experience inconsistent implementation of the Indian

41.

Child Welfare Act and its related state law protections, thus continuing the harm and breakup of Indian families. Variation in practice undermines tribal sovereignty, furthers destructive impacts on tribes and tribal communities, puts the lives of Indian children and families at disproportionate risk for multiple adverse outcomes, and fails to address systemic racism." (*Id.*, subd. (b).) In addition to advancing the goals of clarity and consistency under California law (*id.*, subd. c)), Cal-ICWA (§ 224 et seq.) resolved the split of appellate authority over whether or not the duty of initial inquiry under section 224.2, former subdivision (b), arises when a child is taken into protective custody by warrant under section 340, expressly providing that it does (§ 224.2, subd. (b)(2)). (See *In re Jerry R.* (2023) 95 Cal.App.5th 388, 403–404 [addressing *In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743 & *In re Delila D.* (2023) 93 Cal.App.5th 953, & agreeing with *Delila D.* that the duty of initial inquiry applies regardless of how the child is taken into custody].)

As amended, section 224.2 provides, in relevant part, "The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300, 601, or 602 may be or has been filed, is or may be an Indian child." (*Id.*, subd. (a).) "The duty to inquire begins for a county when first contacted regarding a child, including, but not limited to, asking a party reporting child abuse or neglect whether the party has any information that the child may be an Indian child, and upon a county department's first contact with the child or the child's family, including extended family members as defined in paragraph (1) of subdivision (c) of Section 224.1. At the first contact with the child and each family member, including extended family members, the county welfare department or county probation department has a duty to inquire whether that child is or may be an Indian child." (*Id.*, subd. (b)(1).)

Section 224.1, subdivision (c)(1) defines "'[e]xtended family member has the same meaning as defined by the law or custom of the Indian child's tribe or, in the

absence of such law or custom, shall be a person who has reached 18 years of age and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."

"'The juvenile court's finding that ICWA does not apply to the proceeding rests on two elemental determinations, "subject to reversal based on sufficiency of the evidence."' [Citations.] First, '[t]he court must find there is "no reason to know whether the child is an Indian child," which is dependent upon whether any of the six circumstances set forth in subdivision (d) of section 224.2 apply.' [Citations.] Second, '[t]he juvenile court must … find a "proper and adequate further inquiry and due diligence .…"'"" (*In re Jerry R., supra*, 95 Cal.App.5th at p. 427.)

"The juvenile court's finding on the second element 'requires the … court to "engage in a delicate balancing of" various factors in assessing whether the … inquiry was proper and adequate within the context of ICWA and California law, and whether … [there was] due diligence.' [Citations.] Therefore, we employ a hybrid standard and review the court's determination for substantial evidence and abuse of discretion." (*In re Jerry R., supra*, 95 Cal.App.5th at p. 427.)

### F.     Analysis

Mother argues the department failed to comply with ICWA duty of inquiry when, on August 14, 2024, the department sent out relative placement letters to maternal and paternal family members, but did not include a Native American ancestry inquiry. The Attorney General argues that because on August 14, 2024, SSW Arredondo documented receiving permission to conduct a Native American ancestry inquiry, there is evidence to conclude that Native American inquiries were sent with the relative placement letters that were mailed that day.

We do not reach the issue of whether the inquiry was adequate, because the juvenile court did not make a final ICWA finding on or before October 9, 2024.**8** "[B]ecause the juvenile court made no final ICWA ruling at or before the challenged dispositional hearing as to whether the ICWA applied to the proceedings, [the] mother's claim is premature. That is, ICWA issues are not ripe for review. '"Ripeness" refers to the requirements of a current controversy.' [Citation.] An issue is not ripe for review unless and until it is 'sufficiently concrete to allow judicial resolution even in the absence of a precise factual context.' [Citations.] Because the dependency case is still ongoing, any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of the ongoing dependency proceedings. Therefore, we decline [the] mother's invitation to assess the adequacy of the ICWA inquiry and noticing process that is, based on our assessment of the record, still ongoing as well." (*J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 461.) Nothing in the record indicates that SSW Aredondo, or the department, considered the department's ICWA inquiry complete on August 14, 2024 or October 9, 2024. Because the question of whether the department's ICWA inquiry is sufficient is unripe, we decline to address it at this time.

---

**8**     While the San Bernardino County Juvenile Court did make an ICWA finding on September 12, 2022, after transfer, the Kern County Juvenile Court directed further inquiry, mooting any issues arising from the September 12, 2022 order.

**DISPOSITION**

We affirm the juvenile court's October 9, 2024 dispositional order.


MEEHAN, J.

WE CONCUR:


PEÑA, Acting P. J.


SNAUFFER, J.